# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OLUWOLE AKINDELE (#2013-1005137), ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SUPERINTENDENT ARCE and DIRECTOR ) <br> REYES, ) <br> ) <br> Defendants. ) | Case 15 C 3081 <br><br> Judge Gary Feinerman |

### MEMORANDUM OPINION AND ORDER

Oluwole Akindele, a pretrial detainee at Cook County Jail, alleges in this 42 U.S.C. § 1983 suit that jail officials failed to protect him from an attack by another detainee. Doc. 13. Four defendants were dismissed on initial review. Doc. 12. The remaining defendants, Frank Arce and Mario Reyes, have moved for summary judgment. Doc. 61. The motion is denied.

### Background

Consistent with the local rules, Defendants filed a Local Rule 56.1(a)(3) statement of undisputed facts along with their summary judgment motion. Doc. 63. With certain exceptions,[*] the relevant factual assertions in the Local Rule 56.1(a)(3) statement cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement

---

[*] Some assertions in Defendants' Local Rule 56.1(a)(3) statement do not accurately reflect the cited deposition testimony. In those instances, the court will state the facts as set forth in the testimony. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 706 (7th Cir. 2013) ("Where the moving party has undermined its own Local Rule 56.1 assertion through the presentation of contradictory assertions and evidence, a nonmovant's 'admission' of the movant's assertion is not decisive. To find otherwise would serve only to reward parties who successfully obfuscate the record and engage in 'gotcha' litigation tactics."); *Holm v. Vill. of Coal City*, 345 F. App'x 187, 190 (7th Cir. 2009) (holding that the district court properly considered the "record evidence" as opposed to the parties' "characterization of the facts"). In addition, where the Local Rule 56.1(a)(3) statement cites just one portion of a deposition answer in a misleading manner, the court will consider the entire answer and not just the cited portion.

referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). Also consistent with the local rules, Defendants filed and served on Akindele a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment. Doc. 64. Akindele did not file a response brief, a Local Rule 56.1(b)(3)(B) response to the Local Rule 56.1(a)(3) statement, or a Local Rule 56.1(b)(3)(C) statement of additional facts. Docs. 76, 80.

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (third alteration in original) (internal quotation marks omitted); *see also Olivet Baptist Church v. Church Mut. Ins. Co.*, __ F. App'x __, 2017 WL 129943 (7th Cir. Jan. 13, 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions."); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("We have … repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."). Akindele's status as a *pro se* litigant

does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant.") (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Accordingly, the court will accept as true the facts set forth in Defendants' Local Rule 56.1(a)(3) statement, except insofar as the statement does not accurately reflect the cited material, viewing the facts and inferences therefrom in the light most favorable to Akindele. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with [Local Rule 56.1(b)(3)(C)], the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."); *Cady*, 467 F.3d at 1061; *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 943 (7th Cir. 2005); *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003). That said, the court is mindful that "a nonmovant's … failure to comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that [the movant] is entitled to judgment as a

matter of law." *Raymond*, 442 F.3d at 608 (citations omitted). The court therefore will recite the facts in Defendants' Local Rule 56.1(a)(3) statement, as modified where necessary where the statement inaccurately characterizes the cited material, and then determine whether, on those facts, Defendants are entitled to summary judgment.

This case concerns events in Division 10 at Cook County Jail in January 2015. At that time, one of the two remaining defendants, Mario Reyes, was Division 10's director. Doc. 63 at ¶ 44. The other defendant, Frank Arce, was the superintendent of Division 9 and had no supervisory authority in Division 10. *Id*. at ¶¶ 39-40.

From January 18 to January 20, Akindele was housed in Cell 24 in Division 10-1A, which is a segregation unit for general population inmates. *Id*. at ¶ 2. The cell doors in Division 10-1A have slots. Doc. 63-1 at 58-59 (cited in part by Doc. 63 at ¶ 3). When the slots are open, they serve as windows to the interior of the housing unit. *Ibid*. When Akindele was housed in Cell 24, the door slot for his cell and the cells in his immediate vicinity were open, so other inmates could see him by looking through the slots. *Ibid*. After seeing that Akindele was wearing a yellow protective custody jumpsuit, *ibid*., other inmates called him names and told him they would "get" him, Doc. 63 at ¶ 3. Akindele did not know the names of those inmates. *Id*. at ¶ 4.

Akindele sent Arce a letter on January 19 voicing concerns about his placement in a segregation unit. *Id*. at ¶ 5; Doc. 63-1 at 59-60. On January 20, Akindele saw Arce walking through Division 10-1A. Doc. 63 at ¶ 6; Doc. 63-1 at 62. Akindele told Arce that he was not supposed to be in Division 10-1A because he was a protective custody inmate wearing a corresponding (yellow) jumpsuit, instead of the brown jumpsuit worn by segregation inmates. Doc. 63 at ¶ 6; Doc. 63-1 at 62-63 (cited in part by Doc. 63 at ¶ 6); Doc. 63-2 at ¶ 2. Akindele

4

also told Arce that other inmates were yelling at him and threatening to "get" or "kill" him because he was "PC, yellow jumpsuit." Doc. 63-1 at 65 (cited by Doc. 63 at ¶¶ 8-9). Akindele did not provide any names to Arce, as he could not identify the inmates because he did not know them and could not see them through his door slot. *Ibid*. Arce responded, "well, just don't come out of your cell until I figure out what we going to do," and indicated that he would try to have Akindele moved. *Ibid*.

Following this conversation, other inmates called Akindele a "snitch" because he had spoken with Arce. Doc. 63 at ¶ 10. Later that day, Akindele told unspecified officers that he could see Cells 5 and 6 through his door slot, and that the cells' occupants were calling him names and stating that they would "catch [him]" and "beat [him]." *Ibid*.

Later on January 20, Akindele saw Reyes and gave him a letter saying that he was being threatened. *Id*. at ¶¶ 11-12. He also told Reyes "everything that was going on," but did not provide names, cell numbers, or other identifying information. *Id*. at ¶ 12; Doc. 63-1 at 69-70 (cited by Doc. 63 at ¶ 11). In response, Reyes said, "okay, we take care of it. I heard about you. Commander Clemons already told me about you. Oh, you talked to an officer before. Don't worry about it. We take care of it, okay?" Doc. 63-1 at 70 (cited in part by Doc. 63 at ¶ 11).

That evening, Akindele went to Cermak Hospital. Doc. 63 at ¶ 2. He was released on January 23 and returned that evening to a different cell (1102-1, also known as Cell 2) in Division 10-1A. *Id*. at ¶ 13; Doc. 63-1 at 78; Doc. 63-2 at ¶ 3. Akindele remained in Cell 2, which had a door with a slot and a window that allowed other inmates to look in, until approximately 9:00 p.m. on January 29. Doc. 63 at ¶¶ 13, 20; Doc. 63-1 at 82 (cited by Doc. 63 at ¶ 14). During his time in Cell 2, unknown inmates taunted Akindele by saying "[y]ou PC," calling him a "[b]itch," a "snitch," and a "gay ass nigger," and threatening to "kill [him]" and

5

"beat the crap out of [him]." Doc. 63-1 at 82-84 (cited by Doc. 63 at ¶ 14). The inmates hit the window in the door of his cell, causing him to fear that the glass would break. *Id*. at 83 (cited by Doc. 63 at ¶ 14).

Akindele previously had not spoken to or seen those inmates, and he did not know their names. Doc. 63 at ¶¶ 15-18. A detainee in the next cell told Akindele that one of the inmates resided in Cell 6. *Id*. at ¶ 19. Akindele then told two officers that an inmate from Cell 6 was threatening him and that he wanted to "get … out of [t]here" because "[s]omething [was] going to happen" and he "fear[ed] for [his] safety." Doc. 63-1 at 83 (cited by Doc. 63 at ¶ 19).

At around 8:30 p.m. on January 29, after correctional officers allowed the inmates in Cells 5 and 6 to leave their cells, Akindele felt dizzy and attempted to summon an officer by calling through his door slot. Doc. 63 at ¶ 20. At that point, two inmates were outside his door. Doc. 63-1 at 93-94 (clarifying testimony cited by Doc. 63 at ¶ 21). One of the inmates reached through the slot and punched him in the head. Doc. 63 at ¶ 21. As Akindele backed away, the inmate threw a milk carton containing what he believed to be feces and urine through the slot towards him. *Id*. at ¶ 22. Some of the carton's contents got onto his jumpsuit and face. *Id*. at ¶ 23. Following this incident, Akindele had a small bruise on his left temple and experienced slight swelling in this area. *Id*. at ¶ 24. After Akindele reported the attack, a nurse came and gave him an ice pack and Tylenol. *Id*. at ¶ 37. He had a headache that was painful at first, but "after a day or two [he] was fine" and the swelling subsided. *Id*. at ¶ 25.

Akindele learned that the inmate who attacked him was housed in Cell 5 and was called "BD." *Id*. at ¶¶ 27-28. Before January 29, BD had never threatened Akindele and Akindele had never seen BD. *Id*. at ¶¶ 31, 33. The attack was also the first time Akindele interacted with the unknown inmate who was standing with BD during the attack. *Id*. at ¶ 33. Before the attack, the

unknown inmate had never threatened Akindele. *Id.* at ¶ 34. Akindele did not know that BD would punch him or throw the milk carton at him. *Id.* at ¶ 35.

On January 29, around 9:00 p.m., Akindele was transferred back to Cermak. *Id.* at ¶ 38. Before the attack, Arce and Reyes did not know that BD or any other specific inmates in Cells 5 and 6 had threatened Akindele. *Id.* at ¶¶ 42, 46. Arce and Reyes were not in Division 10-1A at the time of the attack. *Id.* at ¶¶ 43, 47.

**Discussion**

Akindele claims that Reyes and Arce failed to protect him from an attack by his fellow detainees. "Because [Akindele] was a pretrial detainee, his deliberate-indifference claim arises under the Fourteenth Amendment's Due Process Clause but is governed by the same standards as a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013); *see also Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016) (reaffirming this due process standard for deliberate indifference claims by pretrial detainees notwithstanding *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015), which holds that the due process standard for excessive force claims by pretrial detainees is less demanding than the Eighth Amendment standard for excessive force claims by convicted inmates).

"Jail officials have a [constitutional] duty to protect inmates from violent assaults by other inmates." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)); *see also Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners."); *Guzman v. Sheahan*, 495 F.3d 852, 856-57 (7th Cir. 2007) ("Prison

officials owe inmates, both those who have been convicted and those being detained while awaiting trial, a duty to protect them from violence inflicted by other inmates."). That said, not every act of detainee-on-detainee violence results in a constitutional violation. *See Dale*, 548 F.3d at 569; *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Rather, "[a] prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). But "[o]nce prison officials know about a serious risk of harm, they have an obligation to take reasonable measures to abate it." *Dale*, 548 F.3d at 569 (internal quotation marks omitted). Accordingly, to prevail on a failure to protect claim, a plaintiff must show that "(1) the harm that befell [him was,] objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012); *see also Gevas*, 798 F.3d at 480; *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010); *Guzman*, 495 F.3d at 857; *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000). These two prongs are known as the "objective and … subjective component[s]" of a deliberate indifference claim. *Gevas*, 798 F.3d at 480.

Defendants focus primarily on the subjective element. Doc. 65 at 8-12. To satisfy the subjective component, the defendant must have "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago*, 599 F.3d at 756. In other words, the plaintiff must adduce evidence showing that the defendant "effectively condone[d] the attack by allowing it to happen." *Ibid*. "Prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they responded reasonably to the risk, even if the harm

ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Guzman*, 495 F.3d at 857 (internal quotation marks omitted); *see also Borello*, 446 F.3d at 749 (noting that an officer is not relieved of liability "simply because he or she takes *any* action in response to a risk of harm to an inmate—that response must be reasonable").

A detainee "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480. Thus, evidence indicating that the detainee identified "a specific, credible, and imminent risk of serious harm" as well as his "prospective assailant" is typically sufficient to support an inference of actual knowledge. *Id*. at 481. But identifying a particular prospective assailant is not an iron-clad requirement; a jailer "cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault," and it also "does not matter whether the risk comes from multiple sources or one source" or "whether the prisoner is at risk for reasons personal to him or because all the prisoners face the risk." *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001). A plaintiff can also prove actual knowledge by demonstrating that "a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 938.

That said, a failure to protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005) (brackets omitted); *see also Gevas*, 798 F.3d at 480-81 ("Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger."). Detention facilities, "after all, are dangerous places often full of people who have demonstrated aggression." *Dale*, 548 F.3d at 569. It follows that negligence, even gross negligence, is

9

insufficient.  *See Borello*, 446 F.3d at 747.  Instead, the official must act "with the equivalent of criminal recklessness."  *Ibid*. (citing *Farmer*, 511 U.S. at 836-37).  "Each case must be examined individually, with particular focus on what the officer knew and how he responded."  *Dale*, 548 F.3d at 570.

Defendants maintain that they are not liable because the record does not suggest that they had any prior knowledge that BD intended to attack Akindele on January 29.  *Id.* at 9-10.  In their view, Akindele had informed them only of unspecific "general threats and name calling" from "unidentified inmates."  *Id*. at 9.  Defendants add that Akindele testified that the particular attack that ultimately befell him was a surprise and that he did not know his attacker.

It is true that "[a]ctual knowledge cannot be imputed to a prison official if the plaintiff himself was unaware of a specific threat."  *Conwell v. Johnsen*, 2016 WL 6661169, at *8 (N.D. Ill. Nov. 9, 2016).  It also is true that a surprise attack often does not provide the notice necessary to render a jail official liable for failing to protect a detainee from the attack.  *See Guzman*, 495 F.3d at 857-58 (affirming summary judgment where the plaintiff "never before had interacted with" his assailant prior to being attacked and had not advised the defendant that the assailant "might be a specific danger to him").  However, the portions of the record cited by Defendants' Local Rule 56.1(a)(3) statement would allow a reasonable jury to find that, while Defendants might not have been on notice that a *specific* detainee posed a risk of attack, they were aware that Akindele faced death threats due to his status as a protective custody inmate wearing a yellow jumpsuit in a segregation unit—a concrete danger that they could and should have remedied.

Viewed in Akindele's favor and crediting his testimony, the record shows the following.  Akindele spoke with Defendants on January 20 and gave them letters concerning his situation.  Akindele told Arce that he was not supposed to be in Division 10-1A because he was a

10

protective custody inmate wearing a telltale yellow jumpsuit. Akindele told Arce and Reyes that other detainees were threatening him due to his protective custody status, yelling at him, and threatening to "get" or "kill" him. Specifically, Akindele told Arce that "as soon as [he] walked in [to the cellblock], there was voices coming out of the cell; oh, what's that guy coming up? He's PC, yellow jumpsuit. We going to kill him. We going to get him." Doc. 63-1 at 65 (cited by Doc. 63 at ¶¶ 8-9). And after Akindele told Reyes "everything that was going on, me being threatened," Reyes said he was aware of his prior complaints and would "take care of it." *Id*. at 70 (cited in part by Doc. 63 at ¶ 11). A reasonable jury could find on this record that Akindele had effectively told Defendants that his yellow protective custody jumpsuit acted like a matador's red cape, provoking neighboring inmates and creating a high risk of imminent attack.

The court recognizes that the mere fact that protective custody inmates, generally speaking, face a heightened risk of assault "is not enough to establish knowledge of a substantial risk of harm." *Vesey v. Owens*, 2015 WL 3666730, at *8 (N.D. Ill. June 12, 2015) (granting summary judgment on a failure to protect claim, where the only evidence that the defendant prison official knew that the plaintiff was at risk of attack from another inmate was that "[i]nmates in protective custody are always [prone] to danger it could be bullying, sexual abuse/harassment, taking of food etc.") (alterations in original). "Were that enough, prison officials would, in effect, become strictly liable for all violence in the institution. And that, of course, is not the law." *Ibid*. But Akindele's claim here does not rest on his protective custody status alone. Rather, when speaking to Defendants, Akindele linked recent, ongoing threats of imminent violence by a discrete group of inmates to his protective custody status, which was made obvious by his yellow jumpsuit. In addition, when told about the threats, Arce told Akindele to stay in his cell while he determined how to address the situation, and both

11

Defendants indicated that they planned to take action. From this evidence, a reasonable jury could (but need not) conclude not only that Arce and Reyes knew about Akindele's concerns, but also that they believed that Akindele was in genuine danger, above and beyond the dangers faced by most protective custody inmates.

Jailers have a duty to take steps to protect a protective custody inmate who faces such an immediate and tangible threat, even if it does not emanate from a particular, known aggressor. In *Weiss v. Cooley*, the district court granted summary judgment to a defendant officer because the plaintiff did not tell the officer that his ultimate assailants or any other specific inmate in his cell block presented a risk of harm. 230 F.3d at 1032. The Seventh Circuit reversed, explaining that "by focusing so tightly on the specifics of the assault that occurred, the district court did not appreciate the significance of the evidence of [the officer's] state of mind," including the officer's knowledge that the plaintiff was a suspect in a highly publicized rape case and that other inmates were aware of the charges. *Ibid.*; *see also Shultz v. Dart*, 2016 WL 212930, at *2, *7 (N.D. Ill. Jan. 19, 2016) (denying the jail officials' summary judgment motion on a failure to protect claim where "[a] reasonable jury could (though need not) conclude … that it was common knowledge that inmates scheduled for release were at a particular risk of assault" and draw the "inference that this was common knowledge among inmates and custodial staff"). Likewise, viewing the record in the light most favorable to Akindele, Arce and Reyes had knowledge of heightened risk to Akindele based on his particularized circumstances (a detainee in a telltale yellow protective custody jumpsuit being held in close proximity to angry segregation unit detainees who had recently threatened him), assured him that they would deal with the situation, and then failed to do so. That is sufficient to proceed to trial on a failure to protect claim.

12

Defendants also argue that Akindele cannot satisfy the objective element of his claim because his bruise, swelling, and headache for a few days after the incident are *de minimis* injuries. Doc. 65 at 7-8. That argument fails, too, even assuming (perhaps incorrectly) that the bruise, swelling, and headache are insufficient. During the attack, in addition to punching and kicking Akindele, the assailant threw a milk carton containing human waste at him, resulting in some of the contents being splashed onto his jumpsuit and face. In cases where detainees allege deliberate indifference to unconstitutional conditions of confinement, courts take claims of exposure to urine and feces very seriously. *See Norfleet v. Stroger*, 297 F. App'x 538, 540 (7th Cir. 2008) ("courts have been especially cautious about condoning conditions involving exposure to human waste") (quoting *Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004)); *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment."). By the same token, the harm of being struck with human waste is sufficiently severe to satisfy the objective component of a failure to protect claim. *See Lipscomb v. Pfister*, 2014 WL 287269, at *2 (C.D. Ill. Jan. 27, 2014) ("Here, the serious harm was the harm from having bodily fluids, including feces, urine, and blood, thrown onto Plaintiff while he was in the segregation recreation yard."); *Dunham v. Hertz*, 2012 WL 967369, at *3 (S.D. Ill. Feb. 1, 2012) (holding that a reasonable jury could find that a guard unconstitutionally failed to protect a detainee from an assault in which other inmates "threw urine and feces through the bars of [the plaintiff's] cell"); *cf. Lawler v. Marshall*, 898 F.2d 1196, 1197, 1199 (6th Cir. 1990) (holding that a *pro se* "complaint utter[ed] an arguable legal claim of an eighth amendment violation," sufficient to survive initial screening, by alleging

that defendant correctional officers "failed to prevent [another inmate] from throwing food, coffee, milk, bars of soap, and urine" at the plaintiff).

Finally, although Defendants' Local Rule 56.1(a)(3) statement mentions that Arce "had no supervisory power" in Division 10, neither the statement nor the cited evidence explains what "supervisory power" entails, and Defendants do not argue that it was beyond Arce's authority to remedy Akindele's situation. Doc. 65 at 5-6. To the contrary, Akindele testified that Arce told him that he would "figure out what we going to do." Doc. 63-1 at 65. So any argument that Arce lacked the requisite "supervisory power" to be held liable for failing to protect Akindele is both forfeited and, in any event, would be subject to a dispute of material fact.

**Conclusion**

For these reasons, Defendants' summary judgment motion is denied. (Defendants did not seek summary judgment on qualified immunity grounds, so any such argument is forfeited.) This case will proceed to trial on Akindele's failure to protect claim against Arce and Reyes.

February 22, 2017

_____
United States District Judge